We conclude, as did the Court of Appeal, that the plaintiffs are entitled to 22$\frac{5}{40}$ths from the production of both wells.

For the reasons assigned, the judgment of the Court of Appeal is affirmed at defendants' costs.

226 So.2d 494

**Edmond J. HAMILTON et al.**

**v.**

**John J. McKEITHEN, Governor.**

**No. 49762.**

June 9, 1969.

Rehearing Denied Oct. 8, 1969.

Jack P. F. Gremillion, Atty. Gen., Kenneth C. DeJean, Sp. Counsel, Baton Rouge, Willie D. Maynor, Asst. Atty. Gen., Sam H. Jones, Lake Charles, for defendant-appellant.

William M. Nolen, Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, for intervenor-appellant.

Cook, Clark, Egan, Yancey & King, James E. Clark, Shreveport, Leonard C. Wise, Morgan City, for amicus curiae.

Cormie & Morgan, Robert E. Morgan, Lake Charles, for plaintiffs-appellees.

HAMLIN, Justice:

John J. McKeithen, Governor of the State of Louisiana, American Rice Growers Cooperative Association at Lake Charles, Louisiana, the Lake Charles Maritime Association, the Greater Lake Charles Chamber of Commerce, the West Calcasieu Chamber of Commerce, Jesse M. Knowles, A. C. Clemons, Jr., Harry M. Hollins, Robert G. Jones, William L. McLeod, Jr., William S. Boyd, and Conway LeBleu devolutively appeal from a final judgment of the trial court, March 12, 1969, which permanently restrained, enjoined, and prohibited John J. McKeithen, Governor of the State of Louisiana (hereinafter referred to as Governor McKeithen), from making an appointment to the Board of Commissioners of the Lake Charles Harbor and Terminal District under any authority derived from the provisions of Art. XIV, Sec. 30.2(B), La.Const. of 1921, and overruled an exception of no cause of action filed by defendant.[1]

The trial court declared Art. XIV, Sec. 30.2(B), La.Const. of 1921, unconstitutional, stating in reasons for judgment, "Accordingly, this court holds that to deprive these plaintiffs, and the class they represent, of the right to participate in the selection of the Board of Commissioners of the Lake Charles Harbor and Terminal District violates the 14th Amendment of the Constitution of the United States because plaintiffs have been denied equal protection of the laws, and Article 14, Section 30.2(B) of the Louisiana Constitution is unconstitutional."

Act 708, a joint resolution proposing an amendment to Sec. 30.2 of Art. XIV of the Constitution to provide with respect

---

1. It was stipulated among counsel for plaintiffs, defendant, and intervenors that with the agreement of the trial court that this case be heard on the question of the permanent injunction in order that a definitive judgment might be rendered as a result of the hearing. The peremptory exception of no cause of action was referred to the merits.

to the membership and the appointment of the Members of the Board of Commissioners of the Lake Charles Harbor and Terminal District, was enacted during the 1968 Session of the Louisiana State Legislature. The amendment was submitted to the electors for their approval or rejection, and, after approval, was adopted as law November 5, 1968 and duly promulgated December 14, 1968. Art. XIV, Sec. 30.2(B) recites:

"The governing authority of this district shall be a board of commissioners whose members shall be appointed by the governor and which shall be known as the Board of Commissioners of Lake Charles Harbor and Terminal District. The board shall consist of five members who shall be citizens of the United States and qualified voters and taxpayers, and inhabitants of said district during their terms of office. The commissioners shall serve overlapping terms, as established by Act No. 67 of 1924, of six years each. The present members shall continue to serve on the board for the duration of their respective terms. Any vacancies in the membership of the board hereafter occurring by reason of expiration of the terms for which appointed, or by reason of death, resignation or otherwise shall be filled in the following manner:

"(1). The first vacancy on the board shall be filled by appointment by the governor, with the advice and consent of the senate, from a list of three nominees submitted to the governor by the central office of the American Rice Growers Cooperative Association at Lake Charles, Louisiana.

"(2). The next vacancy on the board shall be filled by appointment by the governor, with the advice and consent of the senate, from a list of three nominees submitted to the governor by the Lake Charles and Vicinity Central Trades & Labor Council, AFL-CIO, as one organization.

"(3). The next vacancy on the board shall be filled by appointment by the governor, with the advice and consent of the senate, from a list of three nominees submitted to the governor by the Lake Charles Maritime Association.

"(4). The next vacancy on the board shall be filled by appointment by the governor, with the advice and consent of the senate, from a list of three nominees submitted to the governor by the Greater Lake Charles Chamber of Commerce, and the West Calcasieu Chamber of Commerce acting as one organization.

"(5). The next vacancy on the board shall be filled by appointment by the governor, with the advice and consent of the senate, from a list of three nominees submitted to the governor by the state senators and representatives in the legislature representing the parish of Calcasieu.

"(6). Any further vacancies shall be filled in the same order of rotation as

shown in subsections (1) through (5) of Section B hereof.

"(7). If now, or hereafter, one or more of the five organizations or groups set forth above has no commissioner on the board, the governor, the board, and the five organizations shall proceed to rectify this failure of representation of one or more groups by diverting, in case of a vacancy, from the order of appointments named hereinabove and by receiving nominations instead from the unrepresented organizations or groups, and then thereafter, shall revert to the order of nominations and appointments, as set forth in sub-paragraphs (1) through (5) above. If more than one of the five organizations are unrepresented on the board, priorities shall be in the order of rotation as shown in sub-paragraphs (1) through (5) above, with the American Rice Growers Cooperative Association having first priority in submitting nominees to the governor, the Lake Charles and Vicinity Central Trades & Labor Council, AFL-CIO shall have second priority, the Lake Charles Maritime Association shall have third priority, the Greater Lake Charles Chamber of Commerce and. the West Calcasieu Chamber of Commerce acting as one organization shall have fourth priority, and the Louisiana Legislators representing Calcasieu Parish shall have fifth priority. It is the intention of this language that the purpose of providing one commissioner for each organization shall be corrected and rectified at the earliest possible date, and at the time of the earliest possible vacancy. To facilitate this transition each of the five organizations shall, within 30 days after the promulgation of this amendment, notify both the governor and the board of commissioners whether it has, or has not been provided with a commissioner on the effective date of this amendment, with the name of such commissioner if it has one; and if it has none, it shall so certify such fact to the governor and to the board of commissioners.

"(8). The organizations referred to in Subsection B above shall be understood and construed to be the five organizations presently existing in the city of Lake Charles by the designated names, or their respective legal successors.

"(9). If any one or more of the organizations referred to in Subsection B hereof ceases to exist or to function without any legal successor, then the nominees to be submitted to the governor by such organization shall instead be submitted by the state senators and representatives representing the parish of Calcasieu.

"(10). In the event that for any reason the governor fails to receive three nominees for a given vacancy, as provided in Subsection B above, within sixty days after the expiration of the term of any member of the board 'or the occurrence of a vacancy

on the board from any other cause, the governor shall proceed forthwith to make an appointment to fill such vacancy. The organization failing to submit such nominees shall lose its turn in the rotation.

"(11). Any commissioner may be removed by the governor, but only for cause and on charges preferred against him in writing and after public hearing and proof of the sufficiency of such charges; provided that any commissioner so removed shall have the right to test in the courts the sufficiency of the charges and of the evidence tendered in support thereof.

"(12). The commissioners shall serve without compensation and shall have the power to organize and reorganize legal, executive, engineering, clerical and other departments and forces of the said board and to fix the duties, powers and compensation of all officers, agents and employees of said board."

As residents, citizens and taxpayers of the Parish of Calcasieu residing within the territorial limits of the Lake Charles Harbor and Terminal District, plaintiffs filed a petition for injunction on December 30, 1968. They alleged that the term of office of a Member of the Board of Commissioners of the Lake Charles Harbor and Terminal District (hereinafter referred to as the Harbor District) had expired, and that under the constitutional amendment supra Governor McKeithen had to pick a new Board Member of said Harbor District from a list of three nominees submitted to him by the Central Office of The American Rice Growers Cooperative Association at Lake Charles, Louisiana, a private membership organization. Mainly they contended that the Harbor District with its powers, as set forth infra, directly affected them and their welfare, and that the denial to them of any voice in the selection of members deprived them of equal protection of the laws as guaranteed to them by the Fourteenth Amendment to the United States Constitution. Pertinent allegations of their petition recite:

"The plaintiff[s] has absolutely no voice or choice in the selection of the nominees who are named by The American Rice Growers Cooperative Association at Lake Charles, Louisiana, or the other private membership organizations listed in said Constitutional Amendment of which he is not a member, and from which nominees the Governor must select a member of the Board of Commissioners of the Lake Charles Harbor and Terminal District to spend the taxes paid by the plaintiff[s] and others and to administer the affairs of the District.

"Said Constitutional Amendment involves a Constitutional agency empowered to levy, and actually levying property taxes upon residents and taxpayers living within the area of the District to provide construction of es-

sential facilities, and for the operation and maintenance of these facilities, and neither the American Rice Growers Cooperative Association at Lake Charles, Louisiana nor the other private organizations represent a political group of any mind, or a group authorized by the Constitution and laws of the United States and the State of Louisiana to exercise any kind of public functions, directly or indirectly; and that for these reasons and other reasons shown below, said Constitutional Amendment is illegal and unconstitutional in denying to plaintiff and other taxpayers similarly situated the due process and equal protection which is insured by Constitution of the United States (particularly, the Fourteenth Amendment thereto), and the Constitution of the State of Louisiana.

"That plainly the Constitutional Amendment completely deprives the plaintiff and others similarly situated of any voice, or in the alternative, of an equal voice in the picking of the nominees, as was true under the Constitution and laws of the State of Louisiana prior to the enactment of said Constitutional Amendment, and actually amounts to taxation of the plaintiff without representation, and/or in the alternative, without equal representation."

Answering plaintiffs' petition on January 13, 1969, Governor McKeithen denied the allegations with respect to the unconstitutionality of the constitutional amendment; he asserted the amendment's constitutionality and prayed for the dismissal of plaintiffs' suit. Peremptory exceptions of nonjoinder of indispensable parties and no cause of action were also filed on January 13, 1969.

On January 13, 1969, The American Rice Growers Cooperative Association at Lake Charles, Louisiana, the Lake Charles Maritime Association, the Greater Lake Charles Chamber of Commerce, the West Calcasieu Chamber of Commerce, Jessie M. Knowles, A. C. Clemons, Jr., Harry M. Hollins, Robert G. Jones, William L. McLeod, Jr., William S. Boyd, and Conway LeBleu filed an intervention asserting the constitutionality of Sec. 30.2(B) and praying for the dismissal of plaintiffs' suit.

The trial court rendered judgment in favor of plaintiffs and against defendant and intervenors. It found that the Harbor District was more than an administrative body. It further found that the ruling of Sailors v. Board of Education of County of Kent, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650, to the effect that there was no constitutional reason why state or local officers of the non-legislative character involved in that case might not be chosen by the Governor, by the Legislature, or by some other appointive means rather than by election, was not applicable. Herein, the trial court posed the question of whether the selective process of the constitutional

amendment in question is so arbitrary and invidious as to deny plaintiffs equal protection of the laws. It stated:

"The answer must be in the affirmative. These plaintiffs, and the class they represent, have absolutely no choice in the selection of the board members who have the right to tax them. This is indeed taxation without representation. Four of the five members are selected from a panel of names submitted by private organizations completely beyond and immune to the elective process. The governor who makes the final selection does not even have a choice. He must select one from the panel submitted by the nominating groups."

As stated supra, the trial court held that Sec. 30.2(B) was unconstitutional and granted plaintiffs the relief prayed for.

Defendant assigns the following errors to the judgment of the trial court:

"1. The trial judge erred in holding that the provisions of Article 14, Section 30.2(B) of the Louisiana Constitution were unconstitutional under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States.

"2. The trial judge erred in enjoining the Governor from making any appointment to the Board of Commissioners of the Lake Charles Harbor and Terminal District under an authority derived from Article 14, Section 30.2(B) of the Louisiana Constitution.

"3. In the alternative, and only if this honorable court should conclude that the trial judge did not err in the decisions complained of above, then the trial judge erred in failing to specifically order that the members of the Board of Commissioners of the Lake Charles Harbor and Terminal District be chosen by election and in failing to establish guidelines to be followed by the Legislature of Louisiana in providing for such elections."

Posed for our determination is the question of whether plaintiffs are deprived of equal protection of the laws by Governor McKeithen's appointment—such power of appointment having been vested in him by the Legislature and by the electors of the State—of Members of the Board of Commissioners of the Harbor District rather than by having the members elected by the district's qualified electorate.

The Harbor District was created by Act No. 67 of 1924 as a political subdivision of the State of Louisiana with fixed territorial limits. LSA–R.S. 34:201. The governing authority of the Harbor District is vested in a Board of Commissioners, and the method of selection of the Board is that set forth in Art. XIV, Sec. 30.2(B), La.Const. of 1921, the constitutional amendment in question. The Board may regulate the commerce and traffic of the Harbor District. " * * * it may provide light,

water and police protection for the district and for all harbor and terminal facilities situated therein; it may make and collect reasonable charges for the use of all structures, works and facilities administered by the board, and for any and all services rendered by it; it may regulate, reasonably, the fees and charges to be made by privately owned wharves, docks, warehouses, elevators and other facilities within the limits of the district when the same are offered for the use of the public; it may borrow funds for the business of the district; it may levy and collect taxes; it may mortgage properties constructed or acquired by the district and it may mortgage and pledge any lease or leases and the rents, income and other advantages arising out of any lease or leases granted, assigned or subleased by it; it may incur debt and issue bonds for its needs in the manner provided by the Constitution and laws of the State of Louisiana, including, but not by way of limitation, Article XIV, Section 14, paragraph (b.2) and Article XIV, Section 31 of the Constitution." LSA–R.S. 34:203. See, Wright v. Lake Charles Harbor and Terminal Dist., La. App., 188 So.2d 449; 249 La. 620, 188 So.2d 922. The Board shall control and regulate the exports and imports passing through the port district and the number of arrivals and departures of vessels and their tonnage. LSA–R.S. 34:205. "The board may acquire by purchase, donation, expropriation, lease or otherwise, any and all lands in the district needed for railways, warehouses, docks, wharves, sheds, buildings, canals, channels, slips, basins and other facilities to be owned and operated by the board or to lease to others for manufacturing, commercial and business purposes to promote the industrial development of the district and it may provide for the payment of such land out of the funds under its control not otherwise specially appropriated." LSA–R.S. 34:206. The Board may make or construct any of the works of public improvement in the district and anything in connection therewith that may be necessary or useful for the business of the Board. LSA–R.S. 34:207. The Board may let contracts. LSA–R.S. 34:-208. "The board may, when necessary, levy annually an ad valorem tax not to exceed two and one-half mills on the dollar on the property subject to taxation situated in the district. All funds derived under this Section may be used for any expenses or purposes of the board." LSA–R.S. 34:-209. The Board has the right to borrow money and issue certificates of indebtedness. LSA–R.S. 34:209. The Board is authorized to incur debt and issue negotiable bonds. LSA–R.S. 34:210. The Board may levy taxes to pay for bonds, and in default of payment may have property subject to said taxes sold at tax sale. LSA–R.S. 34:211. The Board may issue refunding bonds. LSA–R.S. 34:214. "The board

shall examine and investigate all questions relating to the interest and welfare of the district; it shall control and regulate the same, and make an annual report to the governor showing all receipts and disbursements of the board." LSA–R.S. 34:205.

Reason dictates that the word "district" employed in Part II, Ports and Harbors, Lake Charles Harbor and Terminal District, LSA–R.S. 34:201–34:241, refers and applies to the Lake Charles Harbor and Terminal District and not to any other political subdivision.[2]

Act 67 of 1924 stated that it was, "Creating the Lake Charles Harbor and Terminal District; establishing a Board of Commissioners therefor; defining their powers, jurisdiction and duties; providing revenue therefor; authorizing said Commission to levy taxes, to incur debt, and to issue bonds for works of public improvements; title to all of which shall be in the public and for public purposes in said District and generally to do any and all things necessary or proper for the government, regulation, development and control of the business of said district and repealing conflicting laws. Due notice of the intention to introduce this act in the Legislature having been published as required by Section 6 of Article IV of the Constitution and evidence of said publication exhibited to the Legislature."

Act 67 of 1924 was enacted by the Legislature, and the members thereof were duly elected by the electors of the State, which electorate included electors from the Harbor District. The Act had a single and special purpose. It created a political subdivision and also created a Board to direct, operate, and govern such subdivision. The subdivision was not strictly a geographical unit; it merely had territorial limits.

■ We find that the original enactment of the Legislature creating the Harbor District meets the following test set forth by the United States Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964):

"But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less."

2. Argument was made in this Court by counsel for plaintiffs that the powers

granted to the Harbor District were not confined to such district.

Differently from the trial judge, we find that the Harbor District is an administrative body and that its Board of Commissioners possesses in the greatest part administrative powers. The power to tax is a limited power and is restricted.

With modernization and transition, port facilities have created great problems in recent years. Their administration is of great import. Therefore, in 1968, the Legislature saw fit to enact a constitutional amendment, Art. XIV, Sec. 30.2(B), supra, providing for what it thought was an efficient means of appointment of the Board of Commissioners of the Harbor District. The appointments by the Governor are from divergent groups all representative of the business and industry of the Harbor District. The fact that the Governor must select at intervals one of three names submitted to him evidences a sense of fairness to the representative groups. The fact that appointments are spaced over a period of years also evidences a sense of fairness in that each group receives its turn for representation. We find that the groups

named by the Legislature are inclusive and not discriminatory and that their composition is embracing of those interests vital to the progress and continuance of the Harbor District.

As stated supra, the instant constitutional amendment was voted on by the electorate of the Harbor District; they voiced their approval. Under such circumstances, we find no denial of equal protection of the laws. We find no deprivation of the right to vote for those who administer the Harbor District's business.

We conclude that the case of Sailors v. Board of Education of County of Kent, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650, is applicable to the instant matter. In that case, the United States Supreme Court stated, "We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election." [3]

We do not find that this matter concerns the "one man-one vote" rule. It does not

3. In the Sailors Case, plaintiffs sought to enjoin the Board of Education of Kent County from detaching certain schools from the City of Grand Rapids and attaching them to Kent County. They also sought to have the county board declared unconstitutionally constituted and to enjoin further elections until the electoral system was redesigned. The people of Michigan (qualified school electors) elected the local school boards. Each board sent a delegate to a biennial meet-

ing, and the delegates elected a county board of five members, who needed not be members of the local boards, from candidates nominated by school electors. Among their powers, the county board had taxing powers. The United States Supreme Court upheld the manner of selecting the county boards, stating, " * * * For while there was an election here for the local school board, no constitutional complaint is raised respecting that the election. Since the choice of

concern apportionment. The case of Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45, is therefore neither applicable nor apposite. That case involved the selection of Members of the Midland County Commissioners Court. After reviewing the matter in the light of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, supra, the United States Supreme Court held that plaintiff, as a resident of Midland County, had a right to a vote for the Commissioners Court of substantially equal weight to the vote of every other resident. It held that the selection of Members of the Court from single-member districts of substantially unequal population violated the Fourteenth Amendment to the United States Constitution. The Court further held that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body. As found supra, such issues are not herein involved.

We find no invidious distinctions in the constitutional amendment under consideration. Invidious distinctions cannot be enacted without a violation of the Equal Protection Clause, but after considering the facts and circumstances of the amend-

ment, the interests which the State is protecting, and the interests of the plaintiffs, we do not find that plaintiffs are suffering taxation without representation or are deprived of equal protection of the laws because they do not have a direct vote for Members of the Board of Commissioners of the Harbor District. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24. Cf. Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; Robertson v. Ott, D.C., 284 F.Supp. 735.

▉ "The burden of establishing the unconstitutionality of a statute rests upon the party who assails it. Thus, one who attacks the limited territorial scope or the classification of a statute has the burden of establishing that the restriction imposed by the Legislature has no rational basis. For the Court to nullify the statute, the record must show that no fair reason supports the legislative judgment." State v. Guidry, 247 La. 631, 173 So.2d 192. See, Francis v. Louisiana State Livestock Sanitary Bd., La.App., 184 So.2d 247; 249 La. 453, 187 So.2d 439. Herein, we do not find that plaintiffs have borne their burden of proving the unconstitutionality of the constitutional amendment; they have not shown that the selective process of appointment to the Board of Commissioners of the

members of the county school board did not involve an election and since none was required for these nonlegislative of-

fices, the principle of 'one man, one vote' has no relevancy."

Harbor District by Governor McKeithen has no rational basis.

In conclusion, we find that Art. XIV, Sec. 30.2(B), La.Const. of 1921, is constitutional. Plaintiffs have suffered neither discrimination nor denial of equal protection of the laws.

For the reasons assigned, the judgment of the trial court is reversed and set aside. Plaintiffs' suit is dismissed at their costs.

SUMMERS, J., is of the opinion a rehearing should be granted.